**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| STEPHEN E. SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:18-cv-01344-DCN-MGB |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| MCLEOD HEALTH CLARENDON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

      This matter is before the court on United States Magistrate Judge Mary Gordon Baker's report and recommendation ("R&R") that the court grant defendant McLeod Health Clarendon's ("McLeod") motion for summary judgment, ECF No. 35. For the reasons set forth below, the court adopts the R&R and grants the motion.

## I.  BACKGROUND

      This case arises out of McLeod's termination of plaintiff Stephen E. Sanders ("Sanders") from his position as an EMS transport coordinator. The R&R ably and comprehensively recites the facts of this case, and Sanders does not object to the R&R's presentation thereof. Therefore, the court provides only a brief summary of those facts material to its legal analysis in lieu of a more thorough recitation.

      McLeod hired Sanders as an EMS transport vehicle paramedic in January 2015. In January 2016, McLeod promoted Sanders to EMS transport coordinator, a primarily administrative position responsible for coordinating and supervising an EMS team's transport to an accident scene. In his new position, Sanders retained the authority to assist with on-scene emergency medical care alongside EMS teams at his discretion, and he did so often. On August 10, 2017, Sanders received a dispatch call alerting him to a

1

serious car accident between a logging truck and an SUV that occurred north of Manning, South Carolina.  Sanders accompanied the EMS team to the accident scene.

Upon the EMS team's arrival, paramedic and shift supervisor Stephanie Hughes ("Hughes") assessed the scene and reported to Sanders that the driver of the SUV, who was pinned in his vehicle beneath the overturned trailer of the logging truck, sustained "an injury incompatible with life", meaning that the team's mission was one of "recovery" rather than "rescue".  Nevertheless, after hearing that the SUV driver was breathing and responding to stimuli, Sanders climbed beneath the overturned trailer to deliver emergency medical care and attempt a rescue.  After a short period of time, tow trucks arrived on the scene and began lifting logs off of the SUV.  Sanders continued to administer emergency medical care to the SUV driver, despite instructions from his EMS team and Clarendon County Fire Department ("CCFD") Captain Ed Gamble ("Gamble") to abandon the accident scene, which Gamble determined to be unstable and unsafe.  Although the specific facts surrounding the altercations between Sanders and other emergency responders at this time are disputed, it is clear that the conflict went on for a significant amount of time, and Sanders admits that the confrontations included "stress-related" words.  ECF No. 38-1, Sanders Depo. at 111:3–13.  The SUV driver ultimately died at the scene.

On the evening of the accident, Sanders called Brad Gerfin ("Gerfin"), the director of EMS and Sanders's direct supervisor at McLeod.  Sanders told Gerfin that Gerfin "may be hearing about" Sanders's behavior at the accident scene because of his altercation with the CCFD and particularly his confrontation with Gamble.  ECF No. 35–4, Gerfin Depo. 20:18–21:3.  The next day, Sanders met Gerfin in his office and informed

Gerfin of the emotional toll he had been experiencing due to the prior day's events and the nature of his job in general. Gerfin gave Sanders the rest of the day off. Later that afternoon, one of the paramedics who was on the scene of the accident informed Gerfin that he needed to "check into" the events that occurred at the accident scene. Id. at 23:8–24:3. Based on that information, Gerfin initiated an investigation into Sanders's conduct during the August 10th accident.

On Monday, August 14, 2017, Sanders returned to work and again met with Gerfin. Gerfin informed Sanders that he had initiated an investigation into Sanders and formally referred Sanders to the Employee Assistance Program ("EAP") so that he could receive professional help and improve his mental health and wellbeing. The next day, Gerfin placed Sanders on paid administrative leave pending the results of the investigation. As part of the investigation, Gerfin procured written statements from several members of the EMS team and the CCFD who were on-site at the accident scene,[1] as well as a report from Sanders detailing his version of the accident, known as a "Trip Report". After reviewing the fruits of the investigation, Gerfin concluded that Sanders "engaged in unprofessional conduct, put his own safety in jeopardy, put the safety of others in jeopardy, and delayed the operation at the accident scene on August 10, 2017." ECF No. 35-8, Gerfin Decl. ¶ 10. On August 18, 2017, Gerfin terminated Sanders's employment.

On April 9, 2018, Sanders filed this action in the Clarendon County Court of Common Pleas, bringing a claim against McLeod for wrongful discharge and failure to

---

[1] The R&R provides a detailed description of each written statement. Rather than restate that which the R&R thoroughly recounted, the court discusses the contents of the written statements as they become relevant to the court's application of the law.

3

accommodate in violation of the Americans with Disabilities Act ("ADA").[2] ECF No. 1-1. In his complaint, Sanders alleges that McLeod fired him because of his disability, post-traumatic stress syndrome ("PTSD"), and that McLeod failed to accommodate Sanders in light of his PTSD. On May 16, 2018, McLeod removed the action to this court where, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.02(B)(2)(g) (D.S.C.), it was referred to the Magistrate Judge. ECF No. 1. On September 27, 2019, McLeod filed a motion for summary judgment, which the parties fully briefed. ECF No. 35. On April 8, 2020, Magistrate Judge Baker filed the R&R, recommending that the court grant the motion. ECF No. 40. On April 21, 2020, Sanders filed objections to the R&R. ECF No. 41. On May 5, 2020, McLeod responded to the objections, ECF No. 42, to which Sanders replied, ECF No. 43. Thus, this matter has been fully briefed and is ripe for the court's review.

## II. STANDARD

### A. R&R

The Magistrate Judge makes only a recommendation to the court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The recommendation carries no presumptive weight, and the responsibility to make a final determination remains with the court. Id. at 270-71. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). The court is charged with making a de novo determination of any portion of the R&R to which a specific objection

---

[2] Sanders also initially brought a claim for civil conspiracy against McLeod and Clarendon County but voluntarily dismissed that claim during discovery.

is made. Id. However, de novo review is unnecessary when a party makes general and conclusory objections without directing a court's attention to a specific error in the magistrate judge's proposed findings. Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a specific objection, the court reviews the R&R only for clear error. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

### B. Motion for Summary Judgment

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial." Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

"The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact."  Major v. Greenville Hous. Auth., 2012 WL 3000680, at *1 (D.S.C. Apr. 11, 2012). Nevertheless, "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " Id. (quoting Fed. R. Civ. P. 56(e)).  The plain language of Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[C]onclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion."  Major, 2012 WL 2000680, at *1.

### III.  DISCUSSION

In the R&R, the Magistrate Judge made three findings to which Sanders objects. As her first and second findings, the Magistrate Judge found that Sanders failed to satisfy both the first and third elements of a prima facie showing of wrongful discharge under the ADA.  Further, the Magistrate Judge found that Sanders did not present sufficient evidence from which a reasonable jury could find that McLeod's stated reason for terminating Sanders was pretext for discrimination.[3]  Sanders objects to each of these

---

[3] The Magistrate Judge also found that Sanders failed to make a prima facie showing of his claim for failure to accommodate under the ADA, noting that "there is no evidence that [McLeod] actually denied [Sanders]'s request for a reasonable

6

findings, arguing that he has presented sufficient evidence to both establish a prima facie case for wrongful discharge under the ADA and to show that McLeod's stated reason for his termination was mere pretext for discrimination on the basis of his disability. The court agrees with the Magistrate Judge's finding that Sanders has not made a prima facie showing of wrongful discharge under the ADA. As such, the court adopts the R&R and grants McLeod's motion.

### A. Wrongful Discharge under the ADA

Sanders asserts that McLeod fired him because of his PTSD, which constitutes a wrongful discharge under the ADA. The ADA prohibits discrimination by a covered entity against any "qualified individual on the basis of disability" in regard to any term or condition of employment. 42 U.S.C. § 12112(a). There are two avenues by which a plaintiff may prove wrongful discharge based on discrimination. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). The first is to offer direct or circumstantial evidence of discrimination, under "ordinary principles of proof." Burns v. AA F—McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996) (internal quotation marks omitted). The R&R found that Sanders has not presented any evidence that might satisfy his burden under this avenue, and Sanders does not object to that finding. The court's analysis therefore focuses on the second avenue by which Sanders may prove his discrimination claim.

---

accommodation." ECF No. 40 at 23. Sanders does not object to this finding, and the court therefore adopts it without conducting further review. See Thomas v. Arn, 474 U.S. 140, 149–50 (1985) (finding that the court may adopt the portions of the R&R to which the petitioner did not object, as a party's failure to object is accepted as agreement with the conclusions of the magistrate judge).

Under the second avenue, Sanders may prove his claim of discrimination pursuant to now-ubiquitous burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, a plaintiff must first establish a "prima facie case of discrimination." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981)). Second, if the plaintiff establishes a prima facie case, the burden of production shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. Lettieri v. Equant Inc., 478 F.3d 640, 646 (4th Cir. 2007). Third, if the defendant shows a legitimate, non-discriminatory reason for its actions, the burden flips back to the plaintiff to show evidence that the defendant's asserted reason for its actions was actually pretext for discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). Despite the shifting burdens of proof, the "ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination" remains with the plaintiff. Lettieri, 478 F.3d at 646.

At the first step of the McDonnell Douglas approach, a plaintiff must establish a prima facie case of wrongful discharge under the ADA. To establish a prima facie case, the plaintiff must show that (1) he was a qualified individual with a disability,[4] (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of discharge, and (4) the circumstances of his discharge raise a reasonable inference of

---

[4] Some courts articulate the first element as requiring the plaintiff to show that "he was within the ADA's protected class." See Haulbrook, 252 F.3d at 702. This is a distinction without a difference because a showing that one is within the "ADA's protected class" requires a showing that one is a "qualified individual" and has "a disability" within the meaning of the ADA.

unlawful discrimination.  Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001).  The R&R found that Sanders failed to satisfy the first and third elements of a prima facie case.

### B.  First Element: Qualified Individual

The R&R found that Sanders failed to meet the first element of prima facie discrimination case for wrongful discharge, reasoning that Sanders could not show that he was a "qualified individual" under the ADA because his PTSD "rendered him entirely unable to work."  ECF No. 40 at 14.  Sanders objects to this finding, arguing that while there is evidence that Sanders could not perform his duties as an on-scene paramedic, that evidence does not support the R&R's conclusion that Sanders could not perform the essential functions of his job, which were primarily administrative.  The court agrees with the Magistrate Judge.

As the first element of a prima facie case of disability discrimination, Sanders must show that he was a qualified individual with a disability at the time of his firing.  There is no dispute that Sanders suffered from PTSD, a disability under the ADA, at the time of his discharge.  The court's inquiry thus focuses on whether Sanders was a "qualified individual."  Under the ADA, "the term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The court agrees with the R&R that summary judgment is warranted on this basis because there is no evidence in the record that Sanders could perform the essential functions of his job at the time of his firing.

As the R&R noted, there is evidence in the record that Sanders could not perform the essential functions of his job at the time of his August 18, 2017 discharge. Sanders testified in his deposition that shortly after the August 10th accident, he began experiencing "severe . . . emotional problems", including "anxiety, depression [and] panic attacks . . . ." ECF No. 35-2, Sanders Depo. 168:19–21; 169:9–10. As a result, Sanders noted that he "couldn't stay around" his place of work. Id. at 169:8. Moreover, Sanders testified that his mental illnesses would prevent him from returning to his job at McLeod:

> Q: Have you applied for any position since your separation from employment with McLeod?
>
> A. No.
>
> Q. Why not?
>
> A. Well, part of the PTSD and the anxiety and what have you is being around people. There's no way I could –- it scares me to think that I could treat a patient right now because I have zero confidence. It scares me to -–I don't even like to hear the ambulance or the sirens come by. It makes me very anxious. I can't be around people.

Id. at 207:9–19. The R&R also noted that Sanders received disability benefits after his termination from McLeod and failed to "directly reconcile his disability benefits with his ADA claim." ECF No. 40 at 16.

In his objection, Sanders argues that he "never testified [that] he was unable to perform the administrative tasks that McLeod had assigned him prior to the accident and[,] in fact, he continued to perform those tasks after the accident." ECF No. 41 at 5. In other words, Sanders argues that while the evidence in the record supports a conclusion that he was unable to perform his duties as an on-scene paramedic, there is no evidence that Sanders could not perform his administrative duties as a transport

coordinator. The problem with Sanders's argument is two-fold. First, Sanders points to no evidence in the record that might support his contention that he could perform his duties as a transport coordinator and instead offers only empty assertions that at the time of his discharge, he was able to perform his "primary job responsibilities." Id. Further, Sanders has presented no evidence from which the court might conclude that the administrative duties of a transport coordinator are the "essential functions" of that position. At this stage, Sanders shoulders the burden to present evidence of the first element of a prima facie case for wrongful discharge—that is, to show that he could perform the essential functions of his position. In the absence of any evidence supporting that element, summary judgment is appropriate. In short, the evidence suggests that Sanders, after the August 10, 2017 accident, could not perform the essential functions of his job, and Sanders has presented no evidence to the contrary.[5]

Further, Sanders has presented no evidence that he could have performed the essential functions of his job with "reasonable accommodations." The R&R noted that "there is no evidence in the record suggesting that [Sanders]'s participation in the EAP would have alleviated his PTSD symptoms to the point where he could have returned to his position." ECF No. 40 at 16. Sanders does not object to this finding of the R&R, nor does he argue in his objections that he could have performed the essential functions of his

---

[5] Sanders presented an unsigned declaration in which he stated, "[W]hile I was participating in the EAP, I was able to continue to do all of the essential administrative and supervisory functions of my job." ECF No. 38-1 at 86. The R&R declined to consider the declaration based on its finding that the declaration conflicted Sanders's earlier deposition testimony and thus could not preclude summary judgment under the "sham affidavit" doctrine. Sanders failed to object to the R&R's finding that the declaration was a "sham affidavit." Therefore, the court reviews the R&R's finding for clear error and finds that it is not clearly erroneous.

job with "reasonable accommodations." Based on the lack of evidence before the court and the burden of production it must apply, the court adopts the R&R's finding that Sanders failed to show that he was a "qualified individual" under the ADA. Therefore, the court rejects Sanders's first objection.

### C. Third Element: Employer's Legitimate Expectations

The third element of a wrongful discharge claim under the ADA requires Sanders to show that he was performing his job at a level that met the legitimate expectations of his employer. Reynolds, 701 F.3d at 150. The R&R found that Sanders failed to satisfy the third element of a prima facie discrimination case under the ADA because he "was not satisfying [McLeod]'s reasonable expectations at the time of his discharge" based on his behavior at the scene of the August 10th accident. ECF No. 40 at 18. As is well-settled law, the R&R "analyze[d] the work performance from the viewpoint of the decision-maker in determining whether the employee was satisfying the legitimate expectations of his employer . . . ." Dinda v. CSC Gov't Sols. LLC, 2019 WL 3244186, at *4 (D.S.C. July 19, 2019). Gerfin, the decision-maker here, based his decision to terminate Sanders on the information he obtained during his investigation of Sanders and the policies to which EMS personnel must adhere. For example, one such policy of vital importance is that a shift supervisor takes the lead during a rescue or recovery mission and that EMS personnel must not break the chain of command. One of the written statements Gerfin reviewed was that of Hughes, the on-scene shift supervisor during the August 10th accident. Hughes reported that Sanders broke the chain of command by disregarding her direct orders, shouted, "Get away from me, I mean it!" in response to orders to stand down, and acted "with a total disregard for his own safety and the safety

12

of other emergency personnel on scene." ECF No. 38-1 at 55. The other statements Gerfin considered contained similar reports of Sanders's actions. While there are factual inconsistencies between the statements of the EMS team members and Sanders about the events surrounding the August 10th accident, there is no dispute about the information on which Gerfin based his decision to discharge Sanders. From the perspective of Gerfin, the R&R correctly concluded, there is no dispute that Sanders was not meeting the legitimate expectations of McLeod, based on his actions at the scene of the August 10th accident.

Sanders objects, arguing only that "a plaintiff's qualifications are to be assessed in terms of whether he or she was meeting the employer's legitimate expectations prior to and independent of the events which led to the adverse action." ECF No. 41 at 6. In other words, Sanders argues that the court may not consider the events surrounding August 10th accident in determining whether Sanders was satisfying McLeod's legitimate expectations at the time of his discharge. In support of his contention, Sanders provides a bare citation to Tysinger v. Police Dep't of City of Zanesville, 463 F.3d 569 (6th Cir. 2006). Sanders's reliance on Tysinger is entirely misplaced.

As a preliminary matter, law from the Sixth Circuit is not binding on this court. Moreover, even if it were, the law Sanders plucks from Tysinger, devoid of any context, is plainly inapplicable to his case. In Tysinger, the Sixth Circuit considered whether the plaintiff presented sufficient evidence to establish a prima facie case of "discrimination because of or on the basis of pregnancy" under the "Pregnancy Discrimination Act provisions of Title VII [of the Civil Rights Act]." 463 F.3d at 572. To satisfy the second element for such a claim in the Sixth Circuit, the plaintiff must show that "she was

qualified for her job." Id. at 573.  Needless to say, that question is distinct from the inquiry relevant here—whether Sanders was satisfying his employer's legitimate expectations at the time of his discharge.  In determining whether the plaintiff satisfied this element, the Sixth Circuit determined that the plaintiff's qualifications "are to be assessed in terms of whether [ ] she was meeting the employer's expectations prior to and independent of the events that led to the adverse action." Id.  The logic of Sixth Circuit's finding is obvious.  In the context of a wrongful discharge due to pregnancy claim, the court should not consider the plaintiff's pregnancy in determining whether or not she was qualified for her job.  It seems equally obvious to the court that both the finding of the Sixth Circuit and the rationale that underlies it are completely irrelevant to this case.

In the context of a wrongful discharge claim under the ADA, the law is clear that the court considers whether a plaintiff was fulfilling his employer's legitimate expectations "at the time of discharge", not prior to the events that led to the plaintiff's firing.  Chauncey v. Life Cycle Eng'g, Inc., 2013 WL 5468237, at *9 (D.S.C. Sept. 30, 2013) (emphasis added).  Sanders asks the court to consider whether he was meeting McLeod's expectations by turning a blind eye to the events that led to his firing.  Of course, the source of an employee's failure to meet his employer's expectations is often the events that led to the employee's firing.  Sanders's interpretation of law would all but eliminate the burden of the plaintiff with respect to the third element of the prima facie case because it would preclude the court from considering the very reason that the employee failed to meet the employer's legitimate expectations.  The court therefore rejects Sanders's second objection and adopts the R&R's finding that Sanders failed to establish a prima facie case of wrongful discharge under the ADA.

Because the court finds that Sanders does not present sufficient evidence to establish a prima facie case, it affirms the R&R without reaching Sanders's third objection.

## IV.   CONCLUSION

For the foregoing reasons the court **AFFIRMS** the R&R and **GRANTS** the motion for summary judgment.

**AND IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　**DAVID C. NORTON**
　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

**June 25, 2020**
**Charleston, South Carolina**